IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

**CHARLES NEMON VANDROSS**          )
                                    )
     Petitioner,          )      C/A No.  1:17-cv-02484-RMG-SVH
                                    )
v.                                  )
                                    )
**BRYAN STIRLING**, *Commissioner*, )
*South Carolina Department of*      )
*Corrections*, and,                 )
*Broad River Correctional Institution.* )
                                    )
                                    )
     Respondent.          )
_____)

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

1. (a)  Charles N. Vandross was convicted and sentenced in the Greenwood County Court of General Sessions in South Carolina.

   (b)  Greenwood County Case No. 2004-GS-24-1187

2. Petitioner was convicted and sentenced on June 21, 2006.

3. Petitioner was sentenced to life in prison.

4. Petitioner was convicted of more than one crime.

5. (a)  Petitioner was convicted of one count of murder and sentenced to life.

   (b)  Petitioner was convicted of burglary, 1st degree and sentenced to life (concurrent).

   (c)  Petitioner was convicted of kidnapping and sentenced to 30 years (concurrent).

   (d)  Petitioner as convicted of possession of a firearm in the commission of a violent crime and sentenced to 5 years, consecutive to the other counts.

6. (a)  Petitioner pleaded not guilty.

(b)     Not applicable.

(c)     Petitioner was tried by a jury.

7.  Petitioner did not testify at trial.

8.  Petitioner appealed his conviction and sentence.

9.  (a)     Petitioner appealed to the South Carolina Court of Appeals.

(b)     *State v. Charles Nemon Vandross*, Unpublished Op. No. 2009-UP-192

(c)     Appeal was dismissed.

(d)     Dismissed on May 5, 2009

(e)     *State v. Vandross*, Unpublished Op. No. 2009-UP-192

(f)     Petitioner raised the following claims on direct appeal:

(i)     The trial judge committed reversible error by preventing the defense from introducing evidence Wilson may have killed Best (and then pinned the homicide on Vandross) out of jealousy over his blatant affairs, as the exclusion of this evidence violated *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941), as well as the Sixth and Fourteenth Amendments, under *Holmes v. South Carolina*, 547 U.S. 319 (2006).

(ii)    The trial judge committed reversible error by allowing into evidence State′s exhibit 34, ″a photograph of a Bible that was laying in close proximity to the victim′s right hand at the incident location,″ and State′s Exhibit 37, ″a photograph…of the same Bible from a slightly different angle,″ as these photographs were irrelevant under Rule 401, SCRE and unfairly prejudicial under Rule 403.

(g)     Petitioner did not seek further review by a higher state court.

10. Other than the direct appeal, Petitioner sought relief by filing an application for post-conviction relief in the state court of South Carolina.

11. (a)     (1)     Petitioner filed an application for post-conviction relief in the Greenwood County Court of Common Pleas.

(2)    Greenwood County Court of Common Pleas Case No. 10-CP-24-259.

(3)    The application was filed on February 26, 2010.

(4)    Petitioner sought post-conviction relief through filing an application for post-conviction relief.

(5)    Petitioner raised the following grounds in his application for post-conviction relief:

    a.    Failure to correct misleading errors in Initial Brief argument after notice by applicant, failure to notify applicant of right to discretionary . . .

    b.    Improper statements

    c.    Failure to order voluntariness hearing before use of defendant statement.

    d.    Failure to object to use of defendant statement without voluntariness hearing.

The Attorney General's Return characterizes the claims as:

    a.    Ineffective Assistance of Trial Counsel;

    b.    Ineffective Assistance of Appellate Counsel;

    c.    Prosecutorial Misconduct (Trial); and

    d.    Judge's Abuse of Discretion (Trial).

(6)    Petitioner received a hearing where evidence was introduced on March 13, 2013.

(7)    Petitioner's application was denied.

(8)    Petitioner's application was denied on March 17, 2014.  [Petitioner filed a *pro se* Applicant's Rule 15 (B) & (C) Motion that PCR counsel ratified on November 19, 2013].

Applicant raised the following claims in his Rule 15(b)&(c) Motion:

1.      Cumulative effect of more than 100 errors rendered unfair trial;

2.      Alleged Confession to Potential Witness Ken Whittington;

3.      Decision Not to Testify;

4.      Solicitor Lowers Standard for Deciding Guilt with Improper Remarks;

5.      Involuntary Statement Used Against Applicant;

6.      Holmes v. SC;

7.      Failure to Object-- Precluding Review;

8.      Prejudicial Advising and Strategizing;

9.      Trial Counsel Vouched for Suber;

10.     Prejudicial Failure to Investigate, Prepare and Be Diligent;

11.     Prejudicial Vouching for the Solicitor;

12.     Appellate Defense Failures Prejudicial Applicant;

13.     Other Issues;

14.     Law;

15.     Conclusion and Order;

16.     Index to New Exhibits;

17.     New Exhibits, Numbered 1-69.

(c)    Petitioner also filed a Motion for a Remand or, in the Alternative for Leave to File a Successor Post-Conviction Relief Application on August 17, 2015 in the South Carolina Supreme Court and raised the following issues:

    (1)    Petitioner has not received his One Bite at the Apple;

    (2)    Petitioner's *Batson* Claim;

    (3)    The Bible Photographs;

    (4)    Lack of Funding to Date;

    (5)    The Court Should Grant Remand for Hearing on Conflict Issue or, in the Alternative, Grant Leave to File a Second PCR.

The South Carolina Supreme Court denied the Motion by order, dated October 8, 2015.

(d)    Petitioner did appeal to the highest state court having jurisdiction over the action taken on the application for post-conviction relief. The South Carolina Supreme Court denied certiorari on July 24, 2017.

## 12. GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF

### (a) RELEVANT FACTUAL INFORMATION

The State tried Charles N. Vandross--***three times***-- for breaking into the home of JoAnn Suber Wilson at night, kidnapping her, and murdering Sanford Best. The first two trials resulted in mistrials because jurors could not come to a unanimous decision on the verdict. At his third trial, and after the Solicitor used all of his peremptory challenges to remove African-Americans from the venire, the jurors convicted Vandross. The Honorable Wyatt T. Saunders, Jr. sentenced Petitioner to life imprisonment for murder, life imprisonment for first-degree burglary, thirty (30) years for kidnapping, and a consecutive five (5) years for possession of a firearm during the commission of a violent crime. Both at trial and during his post-conviction relief proceedings, Petitioner never had access to funding for experts to use in his defense.

Petitioner timely appealed his convictions and sentences. Joseph L. Savitz, III, of the Office of Appellate Defense, raised the issue that the trial court committed reversible error by allowing into evidence two photographs of a Bible located next to the victim's body. One photograph depicted a Bible that was laying in close proximity to the victim's right hand at the incident location, and the other, the same Bible from a very different angle. Counsel argued the photographs were irrelevant under Rule 401, SCRE and unfairly prejudicial under Rule 403. In its opinion, the South Carolina Court of Appeals found this claim procedurally barred.[1] The Court of Appeals affirmed the convictions and sentences, and this Court denied Petitioner's petition for writ of certiorari.

Petitioner then filed an application for post-conviction relief, and David Belding was appointed as his attorney. Despite the irregularities readily apparent from a review of the case, counsel failed to properly raise the *Batson*[2] claim, did not raise the Bible photographs issue, and failed to secure any funding to challenge the State's theory of the case despite the State's heavy reliance on forensic evidence.[3] Petitioner diligently tried to have Belding raise particular issues, but Belding did not do so.

---

[1] The Court of Appeals cited *Holy Loch Distribs., Inc. v. Hitchcock*, 340 S.C. 20, 24, 531 S.E.2d 282, 284 (2000) ("In order to preserve an issue for appellate review, the issue must have been raised to and ruled upon by the trial court."); *State v. Benton*, 338 S.C. 151, 157, 526 S.E.2d 228, 231 (2000) (holding an appellant may not argue one ground for objection at trial and a different ground on appeal).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[3] As contained in the Statement of Relevant Facts, the State called a number of experts: (1) Dr. Joel Sexton who testified not only to cause and manner of death, but also to the acoustic properties of firearms, (2) Adrienne Riley, a forensic DNA analyst with SLED; (3) Tracy Thrower, a firearms identification expert employed by SLED, and (4) Jennifer Stoner, a gunshot residue expert from SLED.

After the further deterioration of Belding's and Petitioner's relationship, and after the evidentiary hearing was held on Petitioner's application, Petitioner moved for the court to relieve Belding of further representation and to appoint new counsel. On October 13, 2013, the Honorable Thomas A. Russo convened a hearing on this motion. Petitioner was not provided with notice of the hearing by either his attorney or the court, and Petitioner did not have his legal materials at this hearing. Judge Russo declined to hear his motion to relieve counsel based on the speculative possibility that "Judge Newman decides and grants [Petitioner's] PCR application."

Petitioner informed Judge Russo, "[T]here were a number of [PCR] issues that were not stated completely, because they were not spoken in court." Petitioner told the court he "followed counsel's lead" and contended that Belding was ineffective during the PCR hearing, despite the Assistant Attorney General's assurances to the contrary.[4] Judge Russo informed Petitioner that alleging ineffective assistance of post-conviction counsel "is not appropriate at this time until you get a ruling from Judge Newman. Because if Judge Newman grants your application, then this is moot. This doesn't matter." Petitioner informed Judge Russo the issues not presented "might not be preserved for further review if not properly" presented. Judge Russo assured Petitioner that if Judge Newman "does not grant your application, then all these rights that you're concerned about here are still available to you." Tr. (10/29/13) 10, ll. 14 – 12, l. 14. *See also* 16, ll. 5-7 ("[I]f Judge Newman does not grant your application, then you can raise these issues.").

---

[4]    At the PCR hearing, the assistant Attorney General was quick to point out that Petitioner did not meet his burden under the case law because Belding failed to call any witnesses to testify at the hearing.

Petitioner reiterated that he "did not receive proper notice of the hearing" and did not have his legal materials with him. Judge Russo ruled, "I'm going to **continue** this matter, give you the opportunity that you need to get the matters that you claim are relevant pursuant to this rule, and we'll just **reschedule it**" (emphasis added). Judge Russo further suggested that Petitioner "hire [counsel] to assist" when the hearing is rescheduled.  Tr. (10/29/13) 16, ll. 21 – 17, l. 12.

Belding then informed the Court that <u>he would not assist Petitioner further</u>, except that he "might send him a written notice" of the hearing. Petitioner informed Judge Russo, "We do not have a[n] amicable relationship." Belding had called Petitioner "stupid" and told Petitioner, "I could take my chances with the Supreme Court. This man does not have my best interest at heart." Petitioner also informed the court that Belding "hasn't availed himself to the materials that I've put before him. There's a lot of things, Your Honor, that he did not do in the PCR hearing." Tr. (10/29/13) 17, ll. 13 – 19, l. 23. Petitioner contended he should be able to "decline" appointed counsel when "there's a conflict of interest." Judge Russo acknowledged he didn't know if there is a conflict of interest "[b]ecause I haven't fleshed that out." Tr. (10/29/13) 22, ll. 10-25.

Judge Russo continued to reassure Petitioner, "[Y]ou're going to have every opportunity that you need to flesh" out the issues with Belding's representation and instructed the motion to be scheduled with the next PCR roster in February 2014.  Judge Russo again reminded Petitioner of the possibility of "hiring another attorney to help you with that" hearing. Tr. (10/29/13) 18, ll. 16-20; 20, line 10 – 21, line 18. After a discussion about the possible timing of Judge Newman's ruling, Judge Russo stressed, "I just want Mr. Vandross to know that he's not losing any rights

here, because we've continued this matter. His rights are – are going to be protected in that fashion." Tr. (10/29/13) 24, line 11 – 25, line 19.

Upon the issuance of an order denying relief, and in which the PCR judge claimed to have reviewed Petitioner's Rule 15, SCRCP motion, even though it had not been filed at that time, Belding then failed to file a Rule 59(e) motion. *Marlar v. State*, 375 S.C. 407, 663 S.E.2d 266 (2006) (defendant's failure to file motion asking post-conviction relief judge to make specific findings of fact and conclusions of law as to rejected post-conviction challenges rendered those challenges waived for appellate review, precluding further review on the merits).

Undersigned counsel was retained by Petitioner's family to represent him in this matter. Upon receipt of the October 29, 2013 transcript, counsel moved the South Carolina Supreme Court to remand the case to develop the record on the issue of the Belding conflict or, in the alternative, to allow Vandross an opportunity to file a new PCR application. By order dated October 8, 2015, the South Carolina Supreme Court denied the motion.

## FACTS OF THE CASE

The State alleged that Petitioner, the erstwhile boyfriend of JoAnn Suber, in a fit of jealousy, entered Suber's house in the middle of the night and killed Suber's other erstwhile and then-current boyfriend, Sanford Best, by shooting him in the head. Then, Petitioner allegedly kidnapped Suber and took her to two different locations for purposes of talking to her, and then returned her back to her house where she was then able to summon for help from the police early in the morning. Two juries were unable to agree on a verdict in this case.

The State's case consisted of JoAnn Suber's testimony, and a substantial amount of forensic evidence that the State argued supported and corroborated her version of events.

Defense counsel did not offer any expert testimony because he did not consult nor retain any experts. Defense counsel, during both trials, [5] labored under the mistaken belief that Petitioner was not entitled to any expert funding because Petitioner's family retained trial counsel. The following is a brief review of the testimony elicited at petitioner's third trial.

JoAnn Suber testified that she began dating Petitioner in July 2003 after they met at a church function. App. 95. He helped her move into her house during that month. By August they were living together in Suber's house. App. 98. According to her, there were problems immediately, although she later backtracked on that testimony on cross-examination. App. 99. Suber testified that she worked as a property manager, and petitioner worked at a local McDonald's restaurant. App. 100. They lived together on-and-off for about 12- 14 months. App. 103. Petitioner eventually rented an apartment in Greenwood, South Carolina as problems began to develop in the relationship. App. 103. Suber testified that in October 2004, the two of them were not living together. App. 103. On October 30, 2004, however, they visited friends in Greenville, SC together. App. 104. Petitioner and Suber were engaged at one point. He proposed to her on Thanksgiving Day, 2003. App. 202.

Suber testified that she had dated Sanford Best, the decedent, in the past. App. 106. On the morning of October 31, 2004, Suber told Petitioner that he needed to leave her house. He left her house before she left for church. App. 107. When Suber returned from church, she called Sanford. He agreed to come over to her house. Suber called her friend, "Jan" and asked her if Sanford could keep his car parked at her house. App. 108. Sanford spent the night. App. 109.

---

[5]     Another attorney represented petitioner at his first trial. The same attorney, Lance Sheek, represented petitioner for trials #2 and #3.

The next day, on November 1, 2004, Suber saw Petitioner when he came to her work place and returned her house key. App. 110.

Suber testified that she then saw Petitioner on November 3, 2004. On that day she went to the Civic Center to watch her son's football game. She also testified that she received a call from another friend, "Sherry," and that afterwards she attempted to secure a restraining order against Petitioner. She testified that she was unable to do so. App. 111. She then called Sanford again that day and he went to her son's game with Suber. App. 113.

Suber testified that she saw Petitioner at her son's game. She was sitting on the highest bleacher. Sanford first spotted Petitioner. She claims that Petitioner was staring at them. App. 113-114. The parties did not speak to one another.

After the ballgame, Sanford took Suber to a cul-de-sac located across from her house. After that, they went to her house. App. 121- 123. Suber and Sanford decided that Sanford would park in front of Suber's house that night, and not behind Jan's.  App. 123. They then fell asleep. Suber testified that she fell asleep wearing her Regency Park shirt, the name of the property for which she was the property manager and where she was working prior to going to her son's football game. App. 127.

Suber claims she was awakened when she realized Petitioner had his hand over her mouth and a gun to her head. She said that he said to her, "Bitch, you better not scream." She testified that they started "tusseling" and that he picked her up and threw her onto the bed. App. 128. She testified that he said to her, "JoAnn, if you don't stop fighting I'm going to include the children in it." App. 128. After that she claims she stopped fighting. She asked him if she could use the bathroom, and he allowed her to do so. App. 128-29. He "pulled [her] up by [her] hair

onto [her] knees" and when she stood up, he pushed "[her] into the bathroom." App. 129. He did not accompany her.

While in the bathroom, she testified that she took some of the blood from her mouth and nose and tried to write Petitioner's name on the wall in her bathroom. App. 129. In her mind, she was trying to write, "Charles V, help me." She testified that she smeared some blood so that when the cops showed up, they would know that it was "foul play." App. 130.

According to her testimony, after she wrote his name in her blood, Petitioner came towards the bathroom. App. 131. She claimed that she could not see his hands. App. 132. He was facing the bed. He came to the bathroom door, and then threw her her clothes, including her pants and boots. App. 132.

According to Suber's testimony, Petitioner then returned to the bed, and then returned to the bathroom and "threw [her] some duct tape." App. 133. He told her to place the duct tape on her mouth. She did so. She said she tried to tear the duct tape with her teeth "trying to leave some more clues." App. 133. She stuck some of the duct tape onto the trash can in the bathroom to also "leave some clues." App. 134. Suber testified that she did not keep any duct tape in the house, suggesting that Petitioner brought it with him. She tried to moisten the tape so that if Petitioner took her around people she would be able to get loose and scream. App. 135. Petitioner came into the bathroom while she was spitting on it, and he took it from her and started wrapping the tape around her head. App. 135.

With the duct tape taped around her head, Suber testified that one nostril was closed and the other was open. App. 140. She claimed that Petitioner then pushed her out of the bathroom and into the bedroom. App. 140. He pushed her through the bedroom and although she was not

sure, she "could have swore" that Sanford had a pillow over his head. App. 140-41. This testimony was hotly contested during this trial by trial counsel.

Then, according to Suber, Petitioner took the keys to her car, and they went out the back door of her house. She noticed that Petitioner put his shoes on. App. 142-43. He also retrieved a flashlight. He opened her car door and placed her in it. Then he went around and got in on the passenger side. App. 144.

Suber testified that Petitioner made her drive to the Tranquil A.M.E. church. There were two houses next to the church, and one of them had a small porch light on. According to Suber, Petitioner saw her look at the house and asked her if that was the parsonage. Suber nodded yes, and then they left that church and pulled out on Highway 221. App. 149. They drove further down the highway.

They drove to the new Tranquil A.M.E. church. According to Suber, Petitioner told her to back in beside the church. There was a silver tank located there. Suber testified that she tried to back into the tank to "blow both of us up." App. 152. Petitioner, according to her, put his foot on her side of the car (presumably the brake) and stopped the car. App. 153. Later, Captain Marcus Cromer testified that he did not see any skid marks at that location. App. 377. Suber testified that Petitioner ripped the tape from her mouth and then "went on just about every argument that we had ever had." App. 153. She testified that she just shut up and listened. App. 154. Before she knew it, it was "3:00 something" in the morning. App. 155. According to her, at some point Petitioner offered the statement that his life was ruined because he killed a man. App. 155.

Petitioner then pulled Suber out of the car. She said to him, "Charles, how could you say I didn't love you? I did love you…Remember you said our hugs was special… (sic). Can we see if our hugs are special now?" She testified that she thought she was going to die anyway and that she was trying to calm him down. App. 156-57. They hugged. Then, according to Suber, Petitioner started quoting scripture from Corinthians, and she started repenting because she thought she was going to die. App. 157.

Shortly after this, Petitioner walked over to her, lifted her head and told her that he would never hurt her. App. 158. They got back into the car. Suber testified that Petitioner placed a clip into his pocket. App. 159.

Suber testified that it was 5:50 am, and that Petitioner told her it was time for the children to get up. Petitioner then took Suber back to her house. App. 160. According to Suber, Petitioner told her that this would be only his first offense, and that he would likely get "8 to 10 years." App. 160. She then drove them both back to her home. Petitioner told her to park in the back. App. 162.

Once parked, Suber exited the car. Petitioner made Suber take off her Regency Park work shirt. App. 164. She testified that he took his fingers and combed her hair into place, and also cleaned her face. App. 165. He told her that she should not try to use the telephone, and that she needed to get the children out of the house by 7:30 am or else he was going "to include the children in it." App. 166.

When she entered the house, she went into her 9 and 13 year olds' room. She woke them up and told them to get dressed. App. 167. Then she went into her older child's room, told him

that Petitioner had killed the decedent, and that he needed to help her get the other children off to school. App. 168-69.

At some point, Suber remembered she had a cell phone in the house. App. 171. She called 911. App. 172. Suber and her children then exited the house. Suber testified she could hear the police sirens. When she saw the police cars, she and her children ran to meet them. App. 178-79.

On cross-examination, trial counsel attempted to elicit more information about Suber and the decedent's tumultuous relationship. On cross, Suber admitted that she had been placed on trespass notice from the decedent's house in the past. App. 191. Suber was upset that he was seeing another woman. On that particular occasion, he refused to open the door and let her in. App. 192. The jury, however, was not allowed to hear this evidence. The jury, instead, was merely allowed to hear that the decedent had "cheating problems."[6] App. 205.

During cross-examination, Suber testified that she did not know where Petitioner's car was parked that night that he arrived at her house. App. 233.

In addition to Suber's testimony, the State called a series of first responders to testify to their observations that early morning. Chris Hammett was one of the initial responding officers. He testified that Petitioner complied with all of law enforcement's orders, and he did not make any effort to run away when he was taken into custody in the back yard of Suber's home. App. 288. Petitioner handed him a gun, and told him that a magazine was in his right front pants pocket. App. 288.

Tony Davis was the major in charge of investigations in November 2004. App. 306. He testified that JoAnn Suber told him where Petitioner's car was located-- on Cedar Springs Road--

_____

and contrary to Suber's trial testimony that she did not know where Petitioner had parked his car. App. 309.

Lieutenant Boggs also responded to the scene. He described the bedroom, and stated that the television was "very loud" when he entered the room. He saw a male laying on the bed with a gunshot wound to his head. App. 327.

## A.    The Physical Evidence

In addition to Suber and the responding officers' testimonies, the State also offered a significant amount of forensic evidence which it claimed corroborated Suber's story and pointed to petitioner's guilt. Petitioner was unable to meaningfully challenge this evidence because trial counsel never consulted or retained any experts, and even though some of this testimony appeared counter-intuitive. For example, JoAnn Suber had an enormous amount of the decedent's blood on her shirt. App. 212. She claimed, however, that she never heard a gunshot. App. 213. Suber was sleeping on the side of the bed closest to the door that Petitioner would have to have entered to do what she alleged happened that night. App. 213.

Eric Inks with the Greenwood County Sheriff's Department was the evidence collections technician for this case. App. 380. He has since been reassigned as a school resource officer. App. 404. Inks collected a gun residue collection kit from Petitioner. App. 381. He also took photographs of Petitioner when he was first taken into custody. App. 382. He processed and photographed the incident location. App. 382. He took a picture of a shell casing that was located on the floor next to the baseboard of the bed. App. 383. He located and photographed a picture of a crumpled up section of duct tape that he located in the front, passenger seat of Suber's car. App. 384.

Defense counsel objected to photographs of the decedent that Inks took during his evidence collection, but the trial court judge overruled the objection. App. 387. The judge warned the jury that they were going to see graphic photographs. App. 388. The state offered two pictures of the decedent's Bible into evidence. App. 391. Defense counsel, however, did not object at the time the photographs were admitted into evidence.[7] App. 392.

Inks also took pictures of Suber's injuries. App. 392. He processed her car for evidence. App. 392. He also photographed both churches. App. 392-93. He took possession of a container from the autopsy that contained a projectile. App. 394. He took possession of the semiautomatic pistol petitioner had in his possession and submitted it to the forensic lab for analysis. App. 395. Inks also secured a roll of duct tape that he recovered from Suber's car. App. 398. He secured the shirt that Petitioner was wearing when he met him at the detention center. App. 399. He took Petitioner's pants into his possession, and placed them in secure holding for later submission to the state forensic lab for analysis. App. 400. Inks also collected blood from Suber's bathroom. App. 401. He took a photograph of a stocking cap located at the residence.  App. 402.  He did not, however, submit that cap for forensic processing. App. 410.

Inks collected a white shirt that appeared to have red or brown stains on it. At the time of trial, he had no idea where it was, or whether any analysis had been conducted on it. App. 406. He collected the shirt from the front passenger floorboard of Suber's car. App. 407. Inks admitted a particular smudge near the bottom looked like it could be a handprint.  App. 407. Inks

---

[7]     This formed the basis of petitioner's second argument on his direct appeal which the South Carolina Court of Appeals concluded was not properly preserved, likely because trial counsel did not renew his objection at the time the photographs were entered into evidence.

did not submit that item to the state forensic lab. App. 407. He admitted that, if those spots were blood, there would be a "good bit" of it on that shirt. App. 414.

Inks admitted that he did not recover any fingerprints, footprints, fibers, hair, etc. that placed Petitioner in Suber's house that day. App. 409-10. Inks did not perform any gunshot residue testing on Suber. App. 411.

Dr. Joel Sexton, a forensic pathologist, also testified for the State. App. 418. He was qualified as an expert in in the field of forensic pathology. App. 420. He testified that he observed a gunshot wound on the decedent, above the right eye. App. 421. Sexton testified that the abraided area on the decedent's head indicates that the gun was against the skin at the time he gun was fired. App. 422. Sexton testified that the gun introduced into evidence was "consistent" with the size of the wound. App. 423.

Then Dr. Sexton additionally passed on his experience as a "master pistol shot and rifleman" and his experience with "competitive shooting" and testified that it would not be unusual for someone not to hear a gunshot blast if it happened right next to a person. App. 424, 428. Dr. Sexton's autopsy report was inconsistent with his courtroom conclusions, and contained what Sexton called "typographical error" in which he described the wound as "distant penetrating." App. 428.

The State called another forensic expert, Adrienne Riley from the South Carolina Law Enforcement Division. App. 458. She was qualified as a forensic DNA analyst. App. 459. She received a number of items, including a blood standard from the decedent, swabs from a gun, cuttings from Petitioner's pants, hair from a piece of silver duct tape, swabs from silver duct tape, pulled head hairs from Suber, cuttings from a shirt, and swabs from a bathroom. App. 459-460.

18

The DNA profile from the gun was too weak to reliably interpret. App. 461. Riley noted that DNA found on the white shirt belonged to the decedent. App. 463. Riley did not detect any blood on the duct tape. App. 465. Riley also did not find any of Petitioner's DNA on the duct tape. App. 465.

The State also called Tracy Thrower, a firearms expert from SLED. App. 477. He was qualified as an expert in firearms identification. App. 480. He testified to his extensive testing of the gun and bullet. App. 482- 486. He concluded that the gun recovered in this case, and from Petitioner, fired the bullet that killed the decedent. App. 486. He also indicated that this particular gun appeared to eject on the right hand side of the gun. App. 489, 491.

The State also called Jennifer Stoner with SLED. She was qualified as an expert witness in gunshot residue. App. 497. She conducted testing on State's Exhibit 52, and said she found round lead particles on both sleeves of the garment. She testified she could not "say I found gunshot residue" because the other necessary elements, antimony and barium, were not present. App. 505-06; 511. She did not receive a GSR testing kit from Suber. App. 512. After Stoner's testimony, the State rested. App. 521. Petitioner did not testify. App. 524-25.

The forensic evidence in this case was critical to the defense because it seriously undermined the credibility of Suber's account of what happened. As defense counsel argued in closing argument:

> First of all, if you remember, JoAnn Wilson (Suber) testified when she is in the bathroom before she comes out what does he do? He throws her clothes. What is one item of clothes I specifically asked her about and she insisted she put it on in that bathroom? That green sweatshirt. That green sweatshirt, before they ever came out. Charles Vandross didn't smear all that on there with that green sweatshirt on. . .

App. 567.

And,

> There is not one single cell of Sanford Best's blood on his hand, on his shirt, on his jacket, on this gun she testified he was holding at that time, on the tape he supposedly picked up and throws to her, on the tape he supposedly wraps around her head right there in the bathroom, on the car he supposedly goes out and gets in, in the seat where he was supposed to be sitting in this car, not one single bit of Sanford Best's blood on any of these things she says he was touching right then.

App. 568.

Throughout defense counsel's closing argument, he attempted to rely on problems with the State's forensics to argue the State failed to meets its burden of proving petitioner guilty. App. 576-584; 585.

> DNA on anything anywhere?  Not for Charles, yes for Sanford.

> Blood.  Again, that matches up with her story? Not a bit.

> Fingerprints.  JoAnn, no.  Sanford in there, we know JoAnn is in there.

> Duct tape roll.  It wasn't so hard to find DNA.  They found DNA on the inside of the roll.  Whose was it?  DNA on the duct tape.  Not Charles.  It was JoAnn's....

> Shell casings at the wrong spot.  Couldn't have been shot where they say its shot at but it's consistent with where JoAnn was.

App. 586-87.

Despite trial counsel's efforts to undermine the State's case without the use of any expert assistance, Petitioner was convicted and sentenced to life in prison. After his unsuccessful direct appeal, Petitioner filed an application for post-conviction relief and was appointed David Belding as his attorney.

## B.    The Post-Conviction Relief Proceeding

During the PCR hearing, Belding essentially abdicated his role as a lawyer and simply put Petitioner on the stand, asked him questions that were easily apparent from the transcript, and encouraged him to make the legal arguments that he should have made on his behalf.

> Q:    Did—and you feel like Mr. Sheek effectively handled the shirt issue at—in his closing argument?

App. 719.

> Q:    How did you want this—what's been premarked for identification as No. 11, what would you have wanted Mr. Sheek to do with this information?

App. 720.

> Q:    Okay.  Did you want Mr. Sheek, your attorney, to challenge her credibility and try to impeach her testimony by use of things like the incident report to show that, in fact, they had had a rocky relationship?

App. 722.

> Q:    Was—was—do you recall whether Ms. Suber-Wilson stated in trial the— anything about the—about the alleged violence between her and Mr. Best?…And in the - in the process of getting ready for trial, had you investigated or looked into the background of Mr. Best to see if, in fact, he had any propensity for violence?

App. 724.

> Q:    Mr. Vandross, how did Mr. Sheek, in your defense, handle the fact that the duct tape that was found in the car had no blood on it?

App. 729.

> Q:    Was there a—did Ms. Suber-Wilson testify—
>
> THE COURT:    Well, whatever she testified to would be in the transcript, wouldn't it?
>
> MR. BELDING:  Absolutely.
>
> THE COURT: So why are you asking him that?

21

App. 736.

> Q:    Handing you what's been premarked as No. 52. Would this display have—
> could Mr. Sheek have used this display to attack in summary form her—
> her testimony that the car lights were on?

MR. JOHNSON:  Your Honor, once again, you sustained this objection.  Unless
he's got the jurors here to testify that it would've changed the outcome of this
trial, I would ask that you direct this—direct Mr. Vandross to move on from this
subject.

THE COURT:  Well, not Mr. Vandross—

MR. JOHNSON:  Oh.

THE COURT:  -- but counsel.

MR. BELDING:  Counsel.

THE COURT:  Yes, sir.

MR. BELDING:  Your Honor, I don't know how I'm going to get all 12 of the
jurors in here to testify about what they would've done with things they didn't
see.  All I'm trying to show is that Mr. Sheek was not effective in representing Mr.
Vandross at trial.

THE COURT:  Well, this entire line of questioning is irrelevant as to any
consideration that I will give to his PCR.  So unless you're just attempting to
establish a record, you're wasting—otherwise wasting time.

App. 758-59.

> Q:    Did – did you all not have a proposed reasonable doubt charge to present
> to the judge?
>
> A:    No, sir, we did not.
>
> Q:    Did you think that—you think that that charge was effective in protecting
> your constitutional rights as to the burden of proof?

App. 760.

22

> Q:    Mr. Vandross, this is your day in court on your post-conviction relief action.  Is there anything that I have not asked you that you would like to tell Judge Newman in considering your application, sir?-

App. 761.

Petitioner then continued to bring issues to the judge's attention on his own. App. 761-792. Other than asking Petitioner additional, perfunctory questions, PCR counsel did not advocate on his client's behalf by presenting argument either on the substantive legal issues, or argue prejudice under *Strickland v. Washington,* 466 U.S. 668 (1984).

On cross-examination, the State promptly questioned Petitioner if his attorney called any forensic experts to testify during the PCR hearing. The answer, clearly, was no. App. 792-797. As was imminently foreseeable, the PCR judge denied Petitioner's claims. *Dempsey v. State*, 363 S.C. 365, 610 S.E.2d 812 (2005) (PCR applicant cannot show he was prejudiced by counsel's failure to call a favorable witness to testify at trial if that witness does not later testify at the PCR hearing or otherwise offer testimony within the rules of evidence); *Lorenzen v. State*, 376 S.C. 521, 657 S.E.2d 771 (2008); *Glover v. State*, 318 S.C. 496, 458 S.E.2d 538 (1995). See also *Putnam v. State*, 417 S.C. 252, 789 S.E.2d 594 (2016). Belding then failed to file a SCRCP 59(e) motion asking the Court to alter or amend its order of dismissal.

Current counsel substituted for Belding, and filed a Motion to Remand or, in the alternative, for Leave to File a Successor Post-Conviction Relief Application due to PCR counsel's failure to meaningfully present claims of trial counsel ineffectiveness. The South Carolina Supreme Court denied the motion on October 8, 2015.

## HABEAS CLAIMS

1. **Petitioner received ineffective assistance of trial counsel when trial counsel failed to obtain funding for expert witnesses when he did not realize he could request funding due to Petitioner's indigent status.**

Petitioner's trial counsel never consulted or secured any experts for either of Petitioner's murder trials because he did not know that he could secure funding for them. Given the State's heavy reliance on forensic testimony, and the two prior mistrials, counsel's performance was objectively both deficient and prejudicial.

At the PCR hearing, the State elicited the following testimony:

Q:    So besides the employer and the preacher, did he provide any other witnesses that you may or may not have called?

A:    No specifically. We discussed different type of experts. But we didn't have a particular one.  And—and I spoke to the preacher and his boss.

Q:    Did you hire or retain any experts in this case?

A:    **I did not.  Told him that I thought it would be very beneficial to us. But I was retained.  And he did not have the funds to do that.**

As a matter of fact, I—I obtained all the transcripts of the state's witnesses' testimony from the second trial at my own expense. It was right at $1,000. He couldn't pay that either. But he did not have any funds to seek an expert.

App. 819 (emphasis added).

As to this claim, the PCR judge's order of dismissal held:

Counsel testified he wanted to retain experts in this case, but Applicant had no funds with which to hire these experts…This Court finds counsel was effective in his representation of Applicant and no prejudice resulted in this case.

App. 1156-57.

Trial counsel rendered ineffective assistance of counsel when he failed to secure experts based on his erroneous belief that he could not petition the court for funding, and Petitioner was prejudiced by his substandard performance. *Strickland v. Washington*, 466 U.S. 668 (1984).

"[T]he United States Supreme Court has held that the defendant must have 'a fair opportunity to present his defense,' thereby requiring the State to provide the 'basic tools' for an adequate defense to an indigent defendant." *Bailey v. State*, 309 S.C. 455, 459, 424 S.E.2d 503, 506 (1992) (quoting *Ake v. Oklahoma,* 470 U.S. 68 (1985)).

South Carolina Code §17-3-50(B) (2003) provides, in pertinent part:

> Upon a finding in *ex parte* proceedings that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court shall authorize the defendant's attorney to obtain such services on behalf of the defendant and shall order the payment, from funds available to the Office of Indigent Defense, of fees and expenses not to exceed five hundred dollars as the court considers appropriate.

Here, trial counsel did not articulate any strategic reason for failing to obtain experts that he, in fact, believed were necessary to Petitioner's case. He simply did not realize that his client had the right to the funding even though it is contained in the statute.

The United States Supreme Court recently rendered its opinion in *Hinton v. Alabama,* 134 S. Ct. 1081 (2014), a case with facts strikingly similar to the one present in this case. In *Hinton*, trial counsel labored under the erroneous belief that there was a funding cap of $1,000 for his use in securing experts for that petitioner's capital trial. The Court easily found counsel rendered ineffective assistance of counsel:

> The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms...In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the

circumstances…Under that standard, it was unreasonable for Hinton's lawyer to fail to seek additional funds to hire an expert where that failure was based not on any strategic choice but on the mistaken believe that available funding was capped at $1,000.

*Id*. at 1088.

As in *Hinton*, trial counsel here also believed that experts would be beneficial for Petitioner's case, but he failed to secure funding for them because he apparently believed that, since he was retained by Petitioner's family, Petitioner would not be entitled to funding. But that belief is not supported by the state statute that addresses funding. Here, trial counsel did not offer any "strategic" reason for failing to request the funding. He simply did not know he could. *Cf. Dempsey v. State*, 363 S.C. 365, 610 S.E.2d 812 (2005) (counsel was effective where he did not call expert to rebut State's expert testimony because he believed the lack of physical evidence of abuse, by itself, was enough to rebut the State's case); *Legare v. State*, 333 S.C. 275, 509 S.E.2d 472 (1998) (stating that where counsel articulates a valid trial strategy for failing to call an expert witness to testify at trial, such conduct will not be deemed ineffective); *Cherry v. State*, 300 S.C. 115, 386 S.E. 2d 624 (1989) (providing an attorney's performance is not deficient if it is reasonable under professional norms).

Also, as in *Hinton*, the state's case against Petitioner was heavily reliant on forensic evidence. Given the centrality of forensic evidence in this case, coupled with the jury's decision not to convict Petitioner after two prior trials, counsel's substandard performance was highly prejudicial. To date, Petitioner, an indigent defendant, has not been allowed to have experts review the forensic evidence in his case, or an investigator to investigate his case, violations of his rights to due process. *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Caldwell v. Mississippi*, 472 U.S. 320 (1985). And see *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the

kind of trial a man gets depends on the amount of money he has″). Trial counsel did not offer any ″strategic reason″ for failing to retain the experts and, in fact, testified that he believed they needed to hire experts. He simply, it appears, did not realize that he could have petitioned the trial court for the funding upon a showing that the services were reasonably necessary. S.C. Code Ann. 17-3-50(B).

Although *Hinton* is the latest iteration of this principle, it is not ″new law.″ In *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985), the United States Supreme Court recognized that indigent defendants are entitled to independent mental health experts when their assistance "may well be crucial to the defendant's ability to marshal a defense." *Id*. at 80. Without independent experts, defendants could be denied "meaningful access to justice." *Id*. 76-77. This is because, while jurors may disregard a defendant's testimony or a lawyer's argument, experts "assist lay jurors, who generally have no training in" scientific or medical matters "to make a sensible and educated determination about" the contested issues. *Id*. 470 U.S. at 81. "By organizing…[data], interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the [expert] for each party enable[s] the jury to make its most accurate determination of the issues before them." *Id*. See also *Cowley v. Stricklin*, 929 F.2d 640 (11th Cir. 1991); *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir.) (*en banc*), *cert. denied*, 499 U.S. 970 (1991); *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990). Because jurors do listen to, are influenced by, and will rely upon the testimony of such experts, a trial may be fundamentally unfair when a party is left without expert assistance. *Ake*, 470 U.S. at 80.

Numerous courts have found reversible error where, as here, a criminal defendant was not provided with the essential experts to challenge the State's presentation of a case. See

*Williamson v. Reynolds*, 904 F. Supp. 1529, 1562 (E.D. Okla. 1995), *aff'd on other grounds*, *sub nom.*, *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (Habeas relief granted due to trial court's failure to provide funding for forensic experts. Court noted "when forensic evidence and expert testimony are critical parts of the criminal prosecution of an indigent defendant, due process requires the State to provide an expert who is not beholden to the prosecution. The fact that forensic evidence and expert testimony are crucial to the prosecution is in and of itself a sufficient showing of the need for expert assistance and that the defendant would be prejudiced without it.") And see *Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1989) (Right to psychiatric assistance is not satisfied by appointing a "neutral" psychiatrist, but requires "the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate—including to decide, with the psychiatrist's assistance, not to present to the court particular claims of mental impairment."). Here, trial counsel did not even bother to petition the court for funds because he simply did not know that he could. Given that there is a statute that authorizes the funding, trial counsel's performance was clearly deficient.

This Court should excuse the procedural default on this claim because Petitioner received ineffective assistance of PCR counsel. Ordinarily a habeas petitioner is procedurally barred from obtaining federal habeas review of a claim if he failed to raise and exhaust the claim in state court. See *Coleman v. Thompson*, 501 U.S. 722 (1991); *Wainwright v. Sykes*, 433 U.S. 72 (1977). Per the procedural default doctrine articulated in these cases, habeas review of the claim is only allowed if the petitioner can show (1) cause for the default and prejudice resulting therefrom, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. See *Coleman*, 501 U.S. at 750.

In some circumstances, a petitioner may establish cause if he was represented by counsel whose performance was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). See *Coleman*, 501 U.S. at 752; *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In *Coleman*, however, the Supreme Court held that because "[t]here is no constitutional right to an attorney in state post-conviction relief proceedings," a federal habeas "petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings" to establish cause. *Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014) (quoting *Coleman*, 501 U.S. at 752).

In *Martinez v. Ryan*, ____ U.S.____, 132 S. Ct. 1309 (2012), the United States Supreme Court announced a "narrow exception" to the *Coleman* rule. The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was [constitutionally] ineffective.

*Id.* at 1320.

*Martinez* then, allows a habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial counsel before the federal court may do so only if: (1) the ineffective assistance of trial counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective assistance of trial counsel claim"; and (4) state law "requires that an ineffective assistance of trial counsel claim be raised in an initial review collateral proceeding." *Trevino v. Thaler*, _U.S._, 133 S. Ct. 1911, 1918 (2013); *Fowler, supra*. These requirements are met in the case before this Court.

To assess this claim on habeas review, this Court looks to the PCR′s court′s order of dismissal. See *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S. Ct. 2590, 2596 (1991) (Courts should ″look through the subsequent unexplained denials to that [last reasoned] opinion, unless respondent has carried his burden of adducing strong evidence that one of the subsequent courts reached the merits of the federal claim″). The PCR judge's order of dismissal is contrary to, or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court regarding ineffective assistance of counsel as propounded in *Strickland v. Washington*, 466 U.S. 668 (1984). Its decision is also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. §2254(d) (1), (2). Petitioner was substantially and injuriously prejudiced by his attorneys' substandard performance. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Petitioner respectfully asks this Court to grant his petition for writ of habeas corpus, and release him from custody.

(b)    Petitioner did not exhaust this claim because he received ineffective assistance of PCR counsel.  *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

(c)    Petitioner did not raise this issue on direct appeal because the issue was not preserved.

(d)    Petitioner did not raise this issue on post-conviction review because he received ineffective assistance of PCR counsel.  *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

(e)    Other Remedies. Current counsel raised this issue to the South Carolina Supreme Court on a Motion to Remand, but the Court denied the motion.

   **2.  Trial counsel rendered ineffective assistance of counsel when he failed to object to the Solicitor′s improper strike of Asia Seigler, an African-American woman from the venire in violation of Batson v. Kentucky.**

At trial, Petitioner raised a *Batson* challenge based on the Solicitor's use of 100% of his peremptory strikes to remove African Americans from the jury:[8]

> Basically the State has exercised seven strikes, including the two for the alternates. Those strikes were exclusively African Americans. Race would not be a proper criteria (sic) to base a strike on and we would challenge the State's strikes.

App. 51.

Solicitor Peace responded, with regard to Juror 112, Asia Seigler, that he struck her for "being unemployed, single." He further stated, "while there may be some single individuals on the jury, I don't think that I sat anybody who was also unemployed, so that was the reason for striking number 112, Asia Seigler." App. 52. Trial counsel pointed out to the judge that Ms. Seigler is a student and that "[w]hile she may not have paid employment, I don't think being a student would be a proper reason to strike someone from the jury." App. 54. The judge asked Peace, "Any Caucasian juror not stricken an unemployed student?" Peace replied, "No, sir, not that I'm aware of. I believe everybody on the jury is employed except I think there may be a housewife." App. 55. The trial court overruled the objection.

Trial counsel rendered ineffective assistance of counsel when he did not argue that removing a student was mere pretext for striking a qualified African-American from the jury. Had he done so, the trial court judge would have found a *Batson* error. This issue is patent on the face of the record, and PCR counsel should have raised this obvious issue.

PCR counsel further failed in his duty to Petitioner when he did not file a SCRCP Rule 59(e) motion to contest the PCR court's erroneous interpretation of the claim:

The PCR judge found:

---

[8]    The only African-American juror that the Solicitor did not strike had a daughter-in-law employed as a Correctional Officer at McCormick Correctional Institution. App. 776.

This Court finds Counsel was effective in his representation of Applicant by filing a *Batson* motion. Applicant alleges counsel was ineffective for not challenging two jurors because one was a student and the other an unemployed housewife. Applicant's understanding of a *Batson* challenge is misguided. A *Batson* challenge is an objection to a preemptory challenge based solely on a juror's race. In this case, Applicant is not claiming race as a factor for the State's strikes but lack of employment. Employment status is not a ground for a *Batson* challenge. Because Applicant has failed to meet his burden of proof under 71.1(e) SCRCP, this allegation is denied.

App. 1160-1161.

The PCR judge's ruling wholly misconstrues the nature of the objection raised at trial.[9] And, because PCR counsel failed to properly raise this issue during the PCR hearing, instead simply calling Petitioner to the stand to try and argue the appropriate legal basis of the claim, the resulting ruling on the issue is nearly incoherent.[10] PCR counsel failed in his duty to properly represent his client during the hearing, and further failed to correct the mistake by pointing out that the transcript of the trial makes it clear that the basis of the challenge was race. For the reasons discussed in the argument above, Petitioner asks this Court to excuse the procedural default due to PCR counsel's ineffectiveness. This Court looks to the PCR's court's order of dismissal on this claim. See *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S. Ct. 2590, 2596 (1991) (Courts should "look through the subsequent unexplained denials to that [last reasoned] opinion, unless respondent has carried his burden of adducing strong evidence that one of the subsequent

---

[9]    The PCR court did not recognize the third step of *Batson*. "In the third step, the opponent of the strike must show that the race-neutral explanation given was mere pretext." *Payton v. Kearse*, 329 S.C. 51, 55, 495 S.E.2d 205, 208 (1998). Pretext "generally is established by showing the party did not strike a similarly-situated member of another race or gender." *State v. Stewart*, 413 S.C. 308, 314, 775 S.E.2d 416, 419 (Ct. App. 2015).

[10]    Counsel's eliciting any information relating to this claim consisted of his asking Vandross, "All right, Mr. Vandross. Anything else that Mr. Sheek did ineffectively on your behalf?" App. 766.

courts reached the merits of the federal claim"). The PCR judge's order of dismissal is contrary to, or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court regarding ineffective assistance of counsel as propounded in *Strickland v. Washington*, 466 U.S. 668 (1984). Its decision is also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. §2254(d) (1), (2). Petitioner was substantially and injuriously prejudiced by his attorneys' substandard performance. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Petitioner respectfully asks this Court to grant his petition for writ of habeas corpus, and release him from custody.

(b)    Petitioner did not exhaust this claim because he received ineffective assistance of PCR counsel. *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

(c)    Petitioner did not raise this issue on direct appeal because the issue was not preserved.

(d)    Petitioner did not raise this issue on post-conviction review because he received ineffective assistance of PCR counsel. *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

(e)    Other Remedies. Current counsel raised this issue to the South Carolina Supreme Court on a Motion to Remand, but the Court denied the motion. The issue was also raised in Petitioner's Petition for Writ of Certiorari to the South Carolina Supreme Court.

3. **The trial judge committed reversible error by preventing the defense from introducing evidence Wilson may have killed Best (and then pinned the homicide on Vandross) out of jealousy over his blatant affairs, as the exclusion of this evidence violated the Sixth and Fourteenth Amendments under *Holmes v. South Carolina*, 547 U.S. 319 (2006).**

Had it been allowed, Petitioner's defense at trial would have been that Wilson killed Best in a jealous rage because of his blatant affairs. The State objected when defense counsel sought to ask Wilson during cross-examination if Best was dating "anybody else" at the time he was killed.

ROA p. 94. Defense counsel argued that the evidence was admissible under *Holmes v. South Carolina* to help establish that Wilson herself was the killer.  ROA, pp. 94-96. The judge sustained the objection. ROA pp. 99-100.

Back on cross, Wilson admitted her relationship with Best had been troubled by "[c]heating issues." ROA p. 105. "I had gone over to his house and seen somebody else there," she testified.  "I was hurt."  ROA p. 105. When Wilson returned to the subject of Best's infidelity on her own, the judge again sustained the State's objection. ROA pp. 130-32. On redirect, Wilson flatly denied shooting Best:

> …I did not kill Sanford.  I loved Sanford, and I could not sit there next to his mama and his family if they even thought I committed a crime against her son I did not kill him.  I did not ask for any of this.

ROA, pp. 168-69.

The trial court judge violated *Holmes v. South Carolina* by excluding evidence that Wilson had a motive to kill Best, jealousy.  *Holmes* is just the latest iteration of a long well-established line of United States Supreme Court cases that hold that a defendant has the right to present a defense.  See *Rock v. Arkansas*, 483 U.S. 44 (1987), *Crane v. Kentucky*, 476 U.S. 683 (1986); *Green v. Georgia*, 442 U.S. 95 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038 (1973) and *Washington v. Texas*, 388 U.S. 14 (1967).

In *Chambers*, the appellant complained that he was denied due process because of the Mississippi trial court's unreasonable exclusion of evidence that tended to support his defense. The case involved the shooting of a policeman. Chambers was arrested and charged with the crime. Another person, McDonald gave a sworn confession to the crime that he later recanted. McDonald also gave a series of confessions to associates of his who were prepared to testify on Chambers's behalf. As for the State's evidence, they offered a sheriff's deputy who testified that

he saw Chambers shoot the victim. Another deputy sheriff observed Chambers "break his arm down" shortly before the shots were fired.

At trial, Chambers offered two lines of defense. First, that he did not shoot the victim. Secondly, that McDonald did. Chambers had been allowed to present some testimony tending to implicate McDonald—by introducing admissible testimony that McDonald had not been at a café where he claimed to be when the shooting occurred, that contrary to his testimony he had not been having a drink with another gentleman, and that he possessed a .22 pistol at the time of the crime (the kind of weapon used to kill the policeman). As the Court noted, "Chambers defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted."

As in Chambers, the trial court judge erred here by not allowing Petitioner the opportunity to meaningfully cross-examine a witness which may have advanced his defense by showing that he was not the killer.

The South Carolina Supreme Court's adjudication of this issue resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and was also based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. §2254(d)(1), (2).

(b) This claim is exhausted.

(c) Direct appeal.

    (1)     Petitioner raised this claim on direct appeal.

    (2)     N/A.

(d) Post-conviction Proceedings. N/A.

(e) Other remedies.  N/A.

18. **TIMELINESS OF PETITION**.  Pursuant to the limitations period prescribed by 28 U.S.C. § 2244(d), this petition is timely if filed on or before September 27, 2017.

**WHEREFORE**, Petitioner asks this Court issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint, and grant such other relief as may be necessary and appropriate.

Respectfully submitted,

/s/ Elizabeth A. Franklin-Best
Elizabeth A. Franklin-Best
Fed ID # 9969
Blume Norris & Franklin-Best, LLC
900 Elmwood Avenue, Ste. 200
Columbia, South Carolina 29201
(803) 765-1044
betsy@blumelaw.com

E. Charles Grose, Jr.
Fed ID #
The Grose Law Firm, LLC
400 Main Street
Greenwood, South Carolina 29646
(864) 538-4466
Charles@groselawfirm.com

September 15, 2017.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.  Executed by retained counsel for Petitioner on September 15, 2017.

BY: /s/Elizabeth A. Franklin-Best